FILED

2025 Jan-02  AM 08:21
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| Jenneka Kimbrough as administrator of the Estate of Ariene Kimbrough<br><br>        Plaintiff,<br><br>   v.<br><br>The Alabama Department of Corrections**,** Trevor Miree, Elvest Lucy, Malcolm Holtzclaw, Nurse John Doe 1, Kimesha Thomas, Terry Wilson, Christopher McLaurin, FNU Evans, FNU Richardson, Sean Bright, Josh Wilburn, FNU Collins, Phillip McMahan, Joshua Beaty, Zachery Roberson, Michael Jones, Brian Gilbert, Officer John Doe 2, in their individual capacities,<br><br>        Defendants. | Case No.<br><br><br>**COMPLAINT FOR DAMAGES**<br><br><br>JURY TRIAL DEMANDED |

## <u>COMPLAINT FOR DAMAGES</u>

Plaintiff Jenneka Kimbrough brings this Complaint to recover for the wrongful death of her brother Ariene Kimbrough who was a prisoner at Limestone Correctional Facility when he was killed by another prisoner on January 4, 2023. From December of 2022 through his death Mr. Kimbrough was suffering from untreated bipolar disorder and in a psychotic state that caused him to act erratically and provoke assaults from other prisoners. From December 2022 through his death he was involved in five assaults with other prisoners. Defendant Alabama Department of Corrections ("ADOC") and Defendant ADOC employees were aware of these altercations and Mr. Kimbrough's erratic behavior, as well as his serious mental illness and psychotic state; but they failed to provide him protection from harm, including protective custody or a single cell to prevent assaults. They also denied him any mental health treatment, failed to provide him his psychotropic

1

medications, and did not refer him to a mental healthcare provider for stabilization. Plaintiff brings this action to vindicate Mr. Kimbrough's rights under the Eighth Amendment, the Americans with Disabilities Act, Section 504 of the Rehabilitation Act of 1973, Section 1557 of the Affordable Care Act, and state law remedies.

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3) because this action asserts one or more deprivations of federal constitutional rights by a state officer.

2.      This Court has supplemental jurisdiction over state law claims.

3.      Venue is proper in the Northeastern Division of the Northern District of Alabama under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

## JURY DEMAND

4.      Plaintiff demands a trial by jury on all issues and claims set forth in this Complaint pursuant to the Seventh Amendment of the U.S. Constitution and Federal Rule of Civil Procedure 38(b).

## PARTES

5.      **Plaintiff Jenneka Kimbrough** is a citizen of the United States of America and is subject to the jurisdiction of this Court. She is the sister of the decedent, Mr. Kimbrough, who died on January 4, 2023 while in ADOC's custody at Limestone. Ms. Kimbrough is the Administrator for the Estate of Ariene Kimbrough.

### The Defendants

### Entity Defendant

6.    **The Alabama Department of Corrections** is the state agency that was legally responsible for the custody of Mr. Kimbrough. ADOC is responsible for the health and safety of all prisoners within its custody and is responsible for contracting of medical services for all ADOC facilities, including Mr. Kimbrough. At all relevant times, ADOC acted through its employees, representatives, staff, and agents.

### Individual Defendants

7.    Plaintiff sues each of the Defendants listed below in his or her individual capacity.

8.    Each of the Defendants listed below acted under color of law when engaging in the misconduct described herein.

9.    Each of the Defendants listed below is above the age of majority.

### Individual Defendants-Bibb

10.    **Trevor Miree** was a correctional officer at Bibb leading up to and during the events described in Plaintiff's Complaint. He was responsible for the safety and security of the prisoners at Bibb and for monitoring and supervising the prisoners. He had the authority to refer prisoners for mental health evaluation and treatment.

11.    **Elvest Lucy** was a lieutenant at Bibb leading up to and during the events described in Plaintiff's Complaint. He was responsible for the safety and security of the prisoners at Bibb, and for monitoring and supervising the prisoners, as well as for supervising subordinate staff. As a lieutenant, he was specifically responsible for ensuring that staff were where they were supposed to be, carrying out their responsibilities and following ADOC and facility security procedures. This includes ensuring that staff were carrying out required monitoring of housing units, security checks, and contraband searches. Lieutenants were also responsible for reviewing all incidents that were reported to them or occurred during their shift, including assaults, to ensure, among other

things, that the perpetrators were correctly identified, that victims and perpetrators were safely housed, and that staff followed all procedures in relation to the incident. He also had the authority to refer prisoners for mental health evaluation and treatment.

12.    **Malcolm Holtzclaw** was a lieutenant at Bibb leading up to and during the events described in Plaintiff's Complaint. He was responsible for the safety and security of the prisoners at Bibb, and for monitoring and supervising the prisoners, as well as for supervising subordinate staff. As a lieutenant, he was specifically responsible for ensuring that staff were where they were supposed to be, carrying out their responsibilities and following ADOC and facility security procedures. This includes ensuring that staff were carrying out required monitoring of housing units, security checks, and contraband searches. Lieutenants were also responsible for reviewing all incidents that were reported to them or occurred during their shift, including assaults, to ensure, among other things, that the perpetrators were correctly identified, that victims and perpetrators were safely housed, and that staff followed all procedures in relation to the incident. He also had the authority to refer prisoners for mental health evaluation and treatment.

13.    **Nurse John Doe 1** was responsible for providing healthcare to prisoners at Bibb leading up to and during the events described in Plaintiff's Complaint, including referring prisoners for mental health evaluation and treatment.

14.    **Kimesha Thomas** was a correctional officer at Bibb leading up to and during the events described in Plaintiff's Complaint. She was responsible for the safety and security of the prisoners at Bibb and for monitoring and supervising the prisoners. She also had the authority to refer prisoners for mental health evaluation and treatment.

15.    **Terry Wilson** was a lieutenant at Bibb leading up to and during the events described in Plaintiff's Complaint. He was responsible for the safety and security of the prisoners

at Bibb, and for monitoring and supervising the prisoners, as well as for supervising subordinate staff. As a lieutenant, he was specifically responsible for ensuring that staff were where they were supposed to be, carrying out their responsibilities and following ADOC and facility security procedures. This includes ensuring that staff were carrying out required monitoring of housing units, security checks, and contraband searches. Lieutenants were also responsible for reviewing all incidents that were reported to them or occurred during their shift, including assaults, to ensure, among other things, that the perpetrators were correctly identified, that victims and perpetrators were safely housed, and that staff followed all procedures in relation to the incident. He also had the authority to refer prisoners for mental health evaluation and treatment.

16.     **Christopher McLaurin** was a lieutenant at Bibb leading up to and during the events described in Plaintiff's Complaint. He was responsible for the safety and security of the prisoners at Bibb, and for monitoring and supervising the prisoners, as well as for supervising subordinate staff. As a lieutenant, he was specifically responsible for ensuring that staff were where they were supposed to be, carrying out their responsibilities and following ADOC and facility security procedures. This includes ensuring that staff were carrying out required monitoring of housing units, security checks, and contraband searches. Lieutenants were also responsible for reviewing all incidents that were reported to them or occurred during their shift, including assaults, to ensure, among other things, that the perpetrators were correctly identified, that victims and perpetrators were safely housed, and that staff followed all procedures in relation to the incident. He also had the authority to refer prisoners for mental health evaluation and treatment.

17.     **First name unknown Evans** was a classification specialist at Bibb leading up to and during the events described in Plaintiff's Complaint. As a classification specialist, Defendant Evans' duties included the adequate classification of prisoners and appropriate housing

assignments for prisoners; this included ensuring that prisoners were appropriately housed considering their known mental health needs and were referred to mental health care providers if necessary. Evans also had the authority to refer prisoners for mental health evaluation and treatment.

18.    **First name unknown Richardson** was a classification supervisor at Bibb leading up to and during the events described in Plaintiff's Complaint. As a classification specialist, Defendant Evans' duties included the adequate classification of prisoners and appropriate housing assignments for prisoners; this included ensuring that prisoners were appropriately housed considering their known mental health needs and were referred to mental health care providers if necessary. Richardson also had the authority to refer prisoners for mental health evaluation and treatment.

<strong>Limestone Individual Defendants</strong>

19.    **Sean Bright** was a lieutenant at Limestone leading up to and during the events described in Plaintiff's Complaint. He was responsible for the safety and security of the prisoners at Limestone, and for monitoring and supervising the prisoners, as well as for supervising subordinate staff. As a lieutenant, he was specifically responsible for ensuring that staff were where they were supposed to be, carrying out their responsibilities and following ADOC and facility security procedures. This includes ensuring that staff were carrying out required monitoring of housing units, security checks, and contraband searches. Lieutenants were also responsible for reviewing all incidents that were reported to them or occurred during their shift, including assaults, to ensure, among other things, that the perpetrators were correctly identified, that victims and perpetrators were safely housed, and that staff followed all procedures in relation to the incident. Bright also had the authority to refer prisoners for mental health evaluation and treatment.

20.    **Josh Wilburn** was a correctional officer at Limestone leading up to and during the events described in Plaintiff's Complaint. He was responsible for the safety and security of the prisoners at Limestone and for monitoring and supervising the prisoners. He had the authority to refer prisoners for mental health evaluation and treatment.

21.    **First name unknown Collins** was a correctional officer at Limestone leading up to and during the events described in Plaintiff's Complaint. He was responsible for the safety and security of the prisoners at Limestone and for monitoring and supervising the prisoners. He had the authority to refer prisoners for mental health evaluation and treatment.

22.    **Phillip McMahan** was a correctional officer at Limestone leading up to and during the events described in Plaintiff's Complaint. He was responsible for the safety and security of the prisoners at Limestone and for monitoring and supervising the prisoners. He had the authority to refer prisoners for mental health evaluation and treatment.

23.    **Joshua Beaty** was a Sergeant at Limestone leading up to and during the events described in Plaintiff's Complaint. He was responsible for the safety and security of the prisoners at Limestone, and for monitoring and supervising the prisoners, as well as for supervising subordinate staff. As a sergeant, he was specifically responsible for ensuring that staff were where they were supposed to be, carrying out their responsibilities and following ADOC and facility security procedures. This includes ensuring that staff were carrying out required monitoring of housing units, security checks, and contraband searches. Sergeants were also responsible for reviewing all incidents that were reported to them or occurred during their shift, including assaults, to ensure, among other things, that the perpetrators were correctly identified, that victims and perpetrators were safely housed, and that staff followed all procedures in relation to the incident. Beaty also had the authority to refer prisoners for mental health evaluation and treatment.

24.     **Zachery Roberson** was a correctional officer at Limestone leading up to and during the events described in Plaintiff's Complaint. He was responsible for the safety and security of the prisoners at Limestone and for monitoring and supervising the prisoners. He also had the authority to refer prisoners for mental health evaluation and treatment.

25.     **Michael Jones** was a lieutenant at Limestone leading up to and during the events described in Plaintiff's Complaint. He was responsible for the safety and security of the prisoners at Limestone, and for monitoring and supervising the prisoners, as well as for supervising subordinate staff. As a lieutenant, he was specifically responsible for ensuring that staff were where they were supposed to be, carrying out their responsibilities and following ADOC and facility security procedures. This includes ensuring that staff were carrying out required monitoring of housing units, security checks, and contraband searches. Lieutenants were also responsible for reviewing all incidents that were reported to them or occurred during their shift, including assaults, to ensure, among other things, that the perpetrators were correctly identified, that victims and perpetrators were safely housed, and that staff followed all procedures in relation to the incident. Jones also had the authority to refer prisoners for mental health evaluation and treatment.

26.     **Brian Gilbert** was a correctional officer at Limestone leading up to and during the events described in Plaintiff's Complaint. He was responsible for the safety and security of the prisoners at Limestone and for monitoring and supervising the prisoners. He had the authority to refer prisoners for mental health evaluation and treatment.

27.     **John Doe 2** was a correctional officer at Limestone leading up to and during the events described in Plaintiff's Complaint. He was responsible for the safety and security of the prisoners at Limestone and for monitoring and supervising the prisoners. He had the authority to refer prisoners for mental health evaluation and treatment.

## FACTUAL ALLEGATIONS

### Relevant ADOC Administrative Policies

28.    Under ADOC's mental health code system, Admin. Reg. § 613, as amended in 2016, mental health classification levels MH–3 through MH–5 referred to prisoners who need inpatient care, in either the residential treatment unit (RTU) or intensive stabilization unit (SU).

29.    Admin. Reg. § 602, during the relevant time period, also defined the term serious mental illness as "[a] substantial disorder of thought, mood, perception, orientation, or memory such as those that meet the DSM IV criteria for Axis I disorders ... [and] persistent and disabling Axis II personality disorders."

30.    Admin. Reg. § 614, during the relevant time period, required that medical and mental health staff at a facility, when notified that a prisoner with a Mental Health Code is being transferred to another facility, ensure that a prisoner has sufficient medication for seven days to ensure continuity of care until a psychiatrist at a receiving facility has time to evaluate the prisoner.

31.    Admin Reg. 627, during the relevant time period, provided for correctional staff training to identify prisoners with mental health crises, including those with significant psychological distress or with a potential emergence of acute psychosis. The regulation outlined a process for correctional staff to make immediate referrals to mental healthcare providers and to engage in crisis intervention efforts including taking appropriate security measures.

32.    Admin Reg. 627 required ADOC correctional to "receive annual training in identifying inmate behaviors and situations suggestive to the development of an inmate crisis." Examples include: "[s]ignificant change in adaptive functioning."

33.    Admin Reg. 627 stated that a referral for Crisis Intervention may be made "by any ADOC or contract staff assigned to an institution."  Crisis intervention efforts include "[m]ental

status assessment" and/or "[a]ssessment of risk for self-harm or other acting-out behavior(s)." Referral to a psychiatrist was appropriate "[i]f inmate might have a serious mental health illness," and/or "[i]f medication might be helpful in stabilizing the inmate's functioning."

34.     Admin. Reg. § 638, during the relevant time, provided that a prisoner be moved to Mental Health Observation when a prisoner was not able to cope effectively in a less restrictive environment due to the impact of a mental disorder.

35.     On June 17, 2014, prisoners filed a class action lawsuit against the Alabama Department of Corrections ("ADOC") alleging that the ADOC's failure to provide adequate mental health treatment to prisoners violated the Constitution. *Braggs v. Dunn*, 2:14-cv-00601 (M.D. Ala).

36.     On June 27, 2017, Judge Thompson concluded that ADOC's "horrendously inadequate" mental health services violated the Eighth Amendment's prohibition of cruel and unusual punishment. *Braggs v. Dunn*, 257 F. Supp. 3d 1171 (M.D. Ala. 2017).

37.     A May 7, 2018 injunctive Order by the *Braggs* Court required that correctional staff, when they "recognize the need for mental health assessment or intervention, such ... staff must refer an inmate for assessment or intervention by the mental health staff." Phase 2A Order and Injunction on Mental Health Identification and Classification Remedy, Attachment B (Doc. 1821-2) § 1.3.

38.     The May 7, 2018 injunction also ordered all security staff to complete a comprehensive mental health training curriculum including on how to use the referral process. *Id.* § 2.6. The training was to include the "early warning signs or symptoms of mental illness," the "availability of mental health services within the ADOC," and the "process for referring inmates

for mental health evaluations." Phase 2A Order and Injunction on Mental Health Identification and Classification Remedy, Attachment A (Doc. 1821-1) §§ 1.2.1-1.2.4.

### Events Leading Up to Mr. Kimbrough's January 4, 2023 Death

39.    Mr. Kimbrough (hereafter "Plaintiff") entered ADOC custody on December 2, 2008, serving a 20-year sentence with an anticipated release date of December 1, 2028.

40.    While housed at Bullock Correctional Facility, Plaintiff often received disciplinary violations for disorderly conduct or insubordination that were linked to Plaintiff's mental health.

41.    On nine separate occasions, from 2010 to 2012, Plaintiff received disciplinary violations while housed in the Bullock Mental Health Unit.

42.    By 2016 while housed at Bullock, Plaintiff was diagnosed with bipolar disorder, assigned a code of MH-5/HC-1, and was sometimes housed in the Mental Health Unit.

43.    By April 2021 Plaintiff had been transferred to Bibb Correctional Facility, where his mental health diagnosis and assigned code were noted.

### The Decomposition of Plaintiff's Mental Health in Fall 2022

44.    Plaintiff stayed at Bibb until December 29, 2022, when he was transferred to Kilby Correctional Facility, and then on December 30, 2022, transferred to Limestone Correctional Facility, where he we killed on January 4, 2023.

45.    In early December 2022 Plaintiff told his sister that he had run out of his prescribed medication for his bipolar disorder and was not being provided continued medication.

46.    From December 2022 through his death, Plaintiff was having a psychotic episode due to his untreated bipolar disorder that caused him to act erratically including by provoking or starting fights with other prisoners.

### A.  The December 13, 2022, altercation at Bibb

47.     On December 13, 2022, at Bibb Plaintiff got into an argument with another prisoner who stabbed him in the arm, requiring Plaintiff to be taken to the hospital.

48.     Defendant Trevor Miree responded to the incident, and Defendant Lieutenant Elvest Lucy was notified of the incident including by interviewing Plaintiff about what happened.

## B.  The December 23, 2022, altercation at Bibb

49.     On December 23, 2022, at Bibb, another prisoner, Jerrickous Mathews, was sweeping around Plaintiff's living area in the visitation area and Plaintiff punched him in the face. When officers arrived they observed Plaintiff naked and acting in an irate manner. The other prisoner had to grab Plaintiff and push him back to prevent him from continuing the assault.

50.     An officer observed Plaintiff's altercation with Mathews. Defendants Miree, Lieutenant Malcolm Holtzclaw, and Lieutenant Elvest Lucy responded to and were notified of the incident.

51.     When he arrived, Defendant Holtzclaw observed Plaintiff in an irate manner and without any clothing on. Defendant Holtzclaw told Plaintiff to put his clothes back on.

52.     Defendant Miree placed Plaintiff in handcuffs and escorted Plaintiff to the Health Care Unit.

53.     At the Health Care Unit, Defendant Nurse John Doe I medically treated Plaintiff. On information and belief Defendant John Doe 1 observed Plaintiff acting erratically, knew from his health records that he was on the mental health case load, and was informed of the assault.

## C.  December 29, 2022, altercation at Bibb

54.     On the morning of December 29, 2022, at Bibb, in the visitation yard, Plaintiff attempted to take a cigarette from another prisoner, Damion Dean, who stabbed Plaintiff in the face with a prisoner made knife, requiring Plaintiff to receive stitches.

55.    Defendant Kimesha Thomas observed Plaintiff in the December 29, 2022 altercation with Dean. Defendants Lieutenants Terry Wilson and Christopher McLaurin responded to the incident and escorted Plaintiff to the Health Care Unit. Defendant Lieutenant Wilson interviewed Plaintiff regarding the incident.

56.    On December 29, 2022, the Bibb Enemy Validation Committee reviewed Plaintiff's December 23 and December 29 altercations and validated Dean and Mathews as enemies of Plaintiff.

57.    Defendant Classification Specialist First Name Unknown Evans knew of Plaintiff's assaultive behavior on December 23 and December 29 because he was a member of the Bibb Enemy Validation Committee and reviewed the incident reports from those dates.

58.    On December 29, 2022, Defendant Evans interviewed Plaintiff and noted that Plaintiff had two validated enemies from his two recent assaults and also suffered from a serious mental illness.

**D.  Transfer From Bibb on December 29, 2022**

59.    On the afternoon of December 29, 2022, Defendant FNU Richardson, Classification Supervisor, ordered Plaintiff to be transferred from Bibb to Kilby. Defendant Richardson noted that Plaintiff had validated enemies at Bibb, had been assaulted, had a pending assault charge on him, and had a serious mental illness. Plaintiff's mental health codes were listed in the transfer order.

60.    Defendant Richardson ordered the transfer from Bibb but failed to take any steps to stabilize Plaintiff or provide him with treatment or medication for his bipolar disorder.

61.    ADOC's own regulations require stabilization of prisoners suffering from serious mental illness and continuity of care including for psychotropic medications before transferring a prisoner.

### E. Transfer to Limestone on December 30, 2022

62.    On December 30, 2022, Plaintiff was transferred from Kilby to Limestone, during the ride to Limestone other prisoners noted that Plaintiff was acting erratically and having a psychotic episode, and an officer radioed ahead to inform Limestone that Plaintiff needed immediate mental health care.

63.    On December 30, 2022, Defendants Lt. Sean Bright and officer Josh Wilburn conducted intake with Plaintiff at Limestone. They conducted an orientation with Plaintiff related to requirements to report sexual abuse and misconduct and the Prison Rape Elimination Act.

64.    On December 30, 2022, on information and belief, Defendants Bright and Wilburn received notice from the radio report that Plaintiff needed immediate mental health care, and reviewed Plaintiff's transfer order from Bibb. Defendants Bright and Wilburn therefore were aware that Plaintiff suffered from a serious mental illness and had been assaulted and assaulted other prisoners at Bibb as recently as December 29, 2022.

### F. January 2, 2023, altercation at Limestone

65.    On January 2, 2023, at Limestone Plaintiff was with several other prisoners in the Restrictive Housing Unit exercise yard.

66.    Another prisoner, Frederick Phillips-Buchanan, declined to give Plaintiff a cigarette. Plaintiff placed Mr. Phillips-Buchanan in a choke hold.

67.    Defendant Officer Phillip McMahan was assigned to housing unit D and observed Plaintiff choking the other prisoner.

68.    Defendant Sgt. Joshua Beaty was notified of the assault and arrived three minutes later to the scene.

69.    Other prisoners observed and reported to the guards that Plaintiff was obviously in a state of psychosis, acting erratically, and in need of mental health medication.

14

70.    Other prisoners in the Restrictive Housing Unit observed that Plaintiff could not carry on normal conversations. He said he knew other prisoners and accused them of "being a rat," despite having never met him before.

71.    Other prisoners in the Restrictive Housing Unit told Defendant Officer FNU Collins that Plaintiff was acting erratically and should not be housed in a cell with other prisoners.

72.    Defendants McMahan and Beaty observed Plaintiff's erratic behavior and clear signs of mental distress, observed or were notified of his assault, and on information and belief were told by other prisoners in the exercise yard that Plaintiff was suffering a mental health crisis.

73.    Defendants McMahan, Beaty, and Collins took no corrective measure to provide for mental health care for Plaintiff or to ensure his safety from starting fights with others: these Defendants took no measure to refer Plaintiff to a mental healthcare provider for stabilization, nor transfer him to a single-cell or controlled environment.

### G. January 4, 2023, altercation and killing at Limestone

74.    On the morning of January 4, 2023, at Limestone Housing Unit C Plaintiff and prisoner Kenyatta Martin got into a verbal or physical altercation.

75.    ADOC officers observed the altercation and decided to place Martin and Plaintiff in the same cell, C65, pursuant to a practice or custom where the guards 'roll the dice' to see if the prisoners will fight again. Martin then stabbed Plaintiff to death.

76.    On information and belief the officers who observed the altercation and then placed Martin and Plaintiff in the same cell, were Defendant Officer Zachery Roberson, who was the Housing Unit C Floor Officer at the time, Defendant Lt. Michael Jones, who was also assigned to supervise the unit and who was stationed nearby, and Defendant Officer Brian Gilbert who was also stationed nearby. Defendant Officer John Doe 2 also observed the altercation and placed Martin and Plaintiff in the same cell.

77.     On information and belief, these four officers had learned of Plaintiff's January 2, 2023, assault and erratic behavior, were informed by other prisoners of his psychotic state, and observed his erratic behavior during his altercation with Martin.

### PLAINTIFF'S DAMAGES

78.     As a result of Defendants' wrongful actions, Plaintiff died and Plaintiff should recover compensatory and punitive damages under federal common law and alternatively, punitive damages under Ala. Code 6-5-41.

### CAUSES OF ACTION

### Count I Eighth Amendment Failure to Protect From Violence

79.     In violation of the Eighth Amendment each of the Defendants described below are liable pursuant to 42 U.S.C. § 1983 for failing to protect Plaintiff from a substantial risk of serious injury from violence at the hands of other prisoners.

80.     Plaintiff's untreated bipolar disorder caused him to act erratically and start or provoke fights with other inmates, as occurred five times from December 2022, through January 4, 2023, and posed a substantial risk of serious injury or death due to assault by other inmates.

81.     Defendants were each subjectively aware of the risk that Plaintiff would incur serious injuries or be killed due to his erratic behavior and unstable mental state.

82.     Defendants each failed to take any reasonable protective measures for Plaintiff's safety including referring Plaintiff for immediate mental healthcare and medication to stabilize Plaintiff, or placing Plaintiff in a single cell or controlled environment.

83.     Each Defendant's failure to take corrective actions proximately caused his death on January 4, 2020, because he remained untreated and unprotected from assault.

84.     Each Defendant is liable as detailed below.

a. Defendants Miree and Lucy learned of Plaintiff's erratic behavior and the assaults on December 13 and 23, 2022, but failed to take any protective measures noted above. *See supra* ¶¶ 47-53.

b. Defendant Holtzclaw learned of Plaintiff's erratic behavior and the assault on December 23, 2022, but failed to take any protective measures noted above. *See supra* ¶¶ 49-53.

c. Defendants Thomas, Wilson, and McLaurin, learned of Plaintiff's erratic behavior and the assault on December 29, 2022, but failed to take any protective measures noted above. *See supra* ¶¶ 54-55.

d. Defendants Evans and Richardson learned of Plaintiff's involvement in assaults at Bibb and that he had a serious mental illness, but failed to take any protective measures noted above. *See supra* ¶¶ 56-58 & ¶¶ 59-61.

e. Defendants Bright and Wilburn learned of Plaintiff's immediate need for stabilizing mental healthcare upon his intake at Limestone, and of his recent assaults at Bibb, but failed to take any protective measures noted above. *See supra* ¶¶ 62-64.

f. Defendants Collins, McMahan, and Beaty on January 2, 2023, learned of Plaintiff's erratic behavior, psychotic mental state, and tendency to start assaults, but failed to take any protective measures noted above. *See supra* ¶¶ 65-73.

g. Defendants Roberson, Jones, Gilbert, and Officer John Doe 2, on January 4, 2023, observed the altercation between Plaintiff and Martin

17

and had learned of his psychotic state, but then 'rolled the dice' by placing

them in the same cell to see if they would attack each other. *See supra* ¶¶

74-77.

### Count II Eighth Amendment Failure to Provide Mental Health Care

85.    In violation of the Eighth Amendment each of the Defendants described below are liable pursuant to 42 U.S.C. § 1983 for failing to provide mental healthcare for Plaintiff.

86.    Plaintiff had a serious need for mental healthcare because of his diagnosed but untreated bipolar disorder causing him to have a psychotic episode in December of 2022 and January of 2023.

87.    Defendants, as described below, were each aware of Plaintiff's serious mental illness, erratic behavior indicating his state of psychosis, and his resultant need for mental healthcare.

88.    Plaintiff was denied the minimally necessary mental healthcare for his untreated bipolar and psychotic episode in December of 2022 and January of 2023, including: immediate provision of his prescribed psychotropic mediation, referral to a mental healthcare provider for stabilization, and housing in a secure environment or single cell to protect him (and others) from his erratic behavior causing him to start and provoke assaults with other prisoners.

89.    This denial of mental healthcare for Plaintiff including provision of his medications, stabilizing treatment by mental healthcare provider, and a safe living environment, proximately caused his death on January 4, 2023.

90.    Each Defendant is liable as detailed below.

> a.    Defendants Miree and Lucy learned of Plaintiff's erratic behavior and the assaults on December 13 and 23, 2022, but failed to take any treatment measures noted above. *See supra* ¶¶ 47-53.

b.      Defendants Holtzclaw and Nurse John Doe 1 learned of Plaintiff's erratic behavior and the assault on December 23, 2022, but failed to take any treatment measures noted above. *See supra* ¶¶ 49-53.

c.      Defendants Thomas, Wilson, and McLaurin, learned of Plaintiff's erratic behavior and the assault on December 29, 2022, but failed to take any treatment measures noted above. *See supra* ¶¶ 54-55.

d.      Defendants Evans and Richardson learned of Plaintiff's involvement in assaults at Bibb and that he had a serious mental illness, but failed to take any treatment measures noted above. *See supra* ¶¶ 56-58 & ¶¶ 59-61.

e.      Defendants Bright and Wilburn learned of Plaintiff's immediate need for stabilizing mental healthcare upon his intake at Limestone, and of his recent assaults at Bibb, but failed to take any treatment measures noted above. *See supra* ¶¶ 62-64.

f.      Defendants Collins, McMahan, and Beaty on January 2, 2023, learned of Plaintiff's erratic behavior, psychotic mental state, and tendency to start assaults, but failed to take any treatment measures noted above. *See supra* ¶¶ 65-73.

g.      Defendants Roberson, Jones, Gilbert, and Officer John Doe 2, on January 4, 2023, observed the altercation between Plaintiff and Martin and had learned of his psychotic state, but failed to take any treatment measures noted above and then 'rolled the dice' by placing them in the same cell to see if they would attack each other. *See supra* ¶¶ 74-77.

**Count III**

**Disability Discrimination and Failure to Accommodate in Violation of the Americans with Disabilities Act, § 504 of the Rehabilitation Act of 1973, and Section 1557 of the Affordable Care Act Against Defendant ADOC**

91.    Defendant ADOC is a public entity that receives federal funding and is subject to the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act, and Section 1557 of the Affordable Care Act ("ACA"), which contain materially similar prohibitions on disability discrimination, and which provide a right to reasonable accommodations.

92.    Plaintiff who had bipolar disorder was a person with a disability as defined in 42 U.S.C. § 12102(1)(A).

93.    Plaintiff's untreated bipolar disorder and state of psychosis in December 2022, and January 2023, substantially limited his major life activities, including caring for himself, learning, concentrating, and thinking, and his major bodily functions, his neurological and brain functions. 42 U.S.C. § 12102(2)(A)-(B).

94.    Plaintiff was a qualified individual for receiving programs and services offered by ADOC including mental health services and accommodations for his bipolar disorder.

95.    ADOC's conduct as alleged in this Complaint violated the ADA, the Rehabilitation Act, and the ACA, because ADOC failed to provide a reasonable accommodation for Plaintiff's bipolar disorder and psychotic state, namely provision of his prescribed psychotropic mediation, referral to a mental healthcare provider for stabilization, and housing in a secure environment or single cell to protect him (and others) from his erratic behavior causing him to start and provoke assaults with other prisoners.

96.    Without these reasonable accommodations Plaintiff was unable to continue accessing the services of the prison.

97.     During December of 2022 and January of 2023 Plaintiff's psychotic state and erratic, assaultive behavior presented an obvious need for these accommodations.

98.     By denying Plaintiff these accommodations Defendant ADOC violated the ADA, Rehabilitation Act, and ACA, and proximately caused Plaintiff's death.

99.     In addition to the failure to accommodate Plaintiff, ADOC discriminated on the basis of his disability, by not treating his bipolar disorder even though ADOC provided treatment for people with other disabilities and for non-disabled prisoners' health conditions.

100.    Defendant ADOC is liable for compensatory damages because high-ranking ADOC officers, including Defendant Lieutenants Lucy, Holtzclaw, Wilson, McLaurin, Bright, and Jones, Sergeant Beaty, and Classification Supervisor Richardson knew that harm to a federally protected right was substantially likely when they denied Plaintiff adequate mental health treatment and a safe living environment. In light of this knowledge Defendants failed to adequately respond and recklessly caused a deprivation of federal rights.

101.    The named ADOC Lieutenants, Sergeant, and Classification Supervisor, had the authority to address the violations of Plaintiff's rights, and their failure to do so constituted an official decision by ADOC.

**Count IV State Law Negligence**

102.    In violation of Alabama law, each of the individual defendants are liable for negligence and breach of their duty to protect prisoners in their custody.

103.    Defendants each had a legal duty under federal and state law to provide for reasonable safety of inmates, including protection from inmate-on-inmate assault. The Alabama Supreme Court has stated that "prison officials have a duty to exercise ordinary and reasonable care for the protection of persons in their custody." *Patton v. Thompson*, 958 So. 2d 303, 310 (Ala. 2006).

104.     Defendants each breached their duty by failing to provide a single cell or controlled living environment for Plaintiff to protect him from his erratic behavior that tended to cause him to start fights and be assaulted, and by failing to obtain mental health treatment including his prescribed psychotropic medication and stabilization.

105.     Defendants' breaches of these duties proximately caused the fatal assault on Plaintiff.

106.     Each Defendant's liability is detailed below.

a.     Defendants Miree and Lucy learned of Plaintiff's erratic behavior and the assaults on December 13 and 23, 2022, but failed to take any protective measures noted above. *See supra* ¶¶ 47-53.

b.     Defendant Holtzclaw and Nurse John Doe 1 learned of Plaintiff's erratic behavior and the assault on December 23, 2022, but failed to take any protective measures noted above. *See supra* ¶¶ 49-53.

c.     Defendants Thomas, Wilson, and McLaurin, learned of Plaintiff's erratic behavior and the assault on December 29, 2022, but failed to take any protective measures noted above. *See supra* ¶¶ 54-55.

d.     Defendants Evans and Richardson learned of Plaintiff's involvement in assaults at Bibb and that he had a serious mental illness, but failed to take any protective measures noted above. *See supra* ¶¶ 56-58 & ¶¶ 59-61.

e.     Defendants Bright and Wilburn learned of Plaintiff's immediate need for stabilizing mental healthcare upon his intake at Limestone, and of his recent assaults at Bibb, but failed to take any protective measures noted above. *See supra* ¶¶ 62-64.

       f.     Defendants Collins, McMahan, and Beaty on January 2, 2023, learned of Plaintiff's erratic behavior, psychotic mental state, and tendency to start assaults, but failed to take any protective measures noted above. *See supra* ¶¶ 65-73.

       g.     Defendants Roberson, Jones, Gilbert, and Officer John Doe 2, on January 4, 2023, observed the altercation between Plaintiff and Martin and had learned of his psychotic state, but then 'rolled the dice' by placing them in the same cell to see if they would attack each other. *See supra* ¶¶ 74-77.

107.    Immunity is unavailable for Defendants because they each acted willfully, maliciously, fraudulently, or in bad faith. Ala. Code § 36-1-12 (d)(2).

108.    Immunity is also unavailable for Defendants because their conduct violated the U.S. Constitution, the Alabama Constitution, and applicable laws and regulations. Ala. Code § 36-1-12 (d)(1).

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that this Court:

    (a)    Grant Plaintiff a trial by jury as to all triable issues of fact;

    (b)    Compensatory damages, including for the loss of the value of Mr. Kimbrough's life and for mental and emotional suffering caused by Defendants' misconduct;

    (c)    Award the Plaintiff punitive damages against each Defendant;

    (d)    Award Plaintiff interest to commence from injury;

    (e)    Grant other such relief as law and equity allows, including costs and reasonable attorney's fees under 42 U.S.C. § 1988.

(f)    All other relief to which Plaintiff may be entitled.

Respectfully submitted, this 31st day of  December, 2024.


/s/ *Andrew Menefee*
Andrew Menefee
**MENEFEE LAW**
Alabama Bar No. 1529W23S
P.O. Box 6134
Montgomery, AL 36106
202-381-0143
amenefee@menefee-law.com

*Counsel for Plaintiff Kimbrough*